Matthew K. Bishop, *admitted pro hac vice*
Montana Bar No. 9968
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Tel: 406-324-8011
bishop@westernlaw.org

*Counsel for Plaintiffs in No. 18-00048*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WildEarth Guardians, a non-profit organization, et al.,<br><br>        Plaintiffs,<br>        vs.<br><br>David Bernhardt, as Secretary of the Department of the Interior, et al.,<br><br>        Federal-Defendants. | No.CV-18-00048-JGZ (member case: consolidated with No. CV-18-00047-JGZ)<br><br>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br> (Hearing Requested) |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

LIST OF EXHIBITS ................................................................................... iv

INTRODUCTION ........................................................................................1

BACKGROUND ...........................................................................................2

I.    The ESA, recovery plans, and delisting criteria ..........................................2

II.   Recovery planning for the Mexican wolf ..................................................5

III.  Guardians' challenge to the 2017 recovery plan...........................................8

STANDARD OF REVIEW ...............................................................................9

ARGUMENT ................................................................................................9

I.    The recovery plan does not include delisting criteria addressing all
      threats to Mexican wolves .......................................................................9

      A.   No delisting criteria to address genetic threats ............................... 10

           1.   Only *effort*, not *results* are required ........................................ 12

           2.   No accounting of the genetic status of Mexican wolves at
                the time of recovery ..................................................... 14

           3.   No connectivity criteria ............................................. 15

      B.   No delisting criteria to address the threat from human-caused
           losses ............................................................................... 17

      C.   No delisting criteria to address the threat from inadequate
           regulatory mechanisms .................................................... 19

      D.   No habitat-based delisting criteria ........................................... 23

CONCLUSION...........................................................................................25

# TABLE OF AUTHORITIES

**CASES:**

*Center for Biological Diversity v. Jewell,*
2018 WL 1586651 (D. Ariz. 2018) .................................................. 5, 17, 20

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ............................................................................9

*Defenders of Wildlife v. Babbitt,*
130 F. Supp.2d 121 (D.D.C. 2001) .................................. 3, 4, 5, 18, 25

*Defenders of Wildlife v. Jewell,*
No. CV-14-02472-JGZ (D. Ariz. 2015) ............................................6

*Fund for Animals v. Babbitt,*
903 F. Supp. 96 (D.D.C. 1995) ....................... 3, 4, 5, 18, 22, 23, 25

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
378 F.3d 1059 (9th Cir. 2004) .........................................................2

*Greater Yellowstone Coalition. v. Servheen,*
665 F. 3d 1015 (9th Cir. 2011) .........................................................9

*League of Wilderness Defenders v. U.S. Forest Serv.,*
549 F.3d 1211 (9th Cir. 2008) .........................................................9

*NEC v. Dombeck,*
304 F.3d 886 (9th Cir. 2002) ...........................................................9

*Oregon Natural Resources Council v. Daley,*
6 F. Supp.2d 1139 (D. Or. 1998) .................................................. 22

*Southwest Center for Biological Diversity v. Babbitt,*
1999 WL 33438081 (D. Ariz. 1999) ............................................ 3, 5

*TVA v. Hill,*
437 U.S. 153 (1978) ...........................................................................2

ii

STATUTES:

5 U.S.C. § 706(2)(A) ...................................................................9

16 U.S.C. § 1533(a)(1) .................................................................4

16 U.S.C. §1553(f) ......................................................................1

16 U.S.C. § 1533(f)(1) ................................................................2

16 U.S.C. § 1533(f)(1)(B)(ii) ............................................. 3, 4, 13

16 U.S.C. § 1540(g)(1)(C) ...........................................................8

FEDERAL REGISTER:

80 Fed. Reg. 2488 (January 16, 2015) ........................................5

85 Fed. Reg. 20967 (April 15, 2020) ..........................................2

1

LIST OF EXHIBITS[1]

2    Exhibit A        Declaration of Kim Crumbo

3    Exhibit B        Declaration of Greta Anderson

4    Exhibit C        Declaration of Nathan Newcomer

5    Exhibit D        Declaration of Madeline Carey

6    Exhibit E        Declaration of John Horning

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] These Exhibits are properly before this Court because they are provided for the sole purpose of demonstrating Plaintiffs in No. 18-00048, WildEarth Guardians *et al.*, meet the minimum requirements for organizational and individual Article III standing.

# INTRODUCTION

The Mexican wolf is one of the most endangered species in North America despite over twenty years of captive breeding and reintroduction efforts. Today, there are less than 200 individuals in the wild and their ability to survive and fully "recover" as envisioned by the Endangered Species Act ("ESA") remains uncertain. This is due to the population's low genetic diversity and small population size, excessive human-caused losses (including illegal killings and agency removals), inadequate regulations, and other threats.

The experts say recovery of Mexican wolves is still possible within the next several decades but only if the U.S. Fish and Wildlife Service ("the Service") moves quickly to alleviate the threats. The best way to do this is by ensuring: (a) there are adequately sized and genetically diverse populations in the wild (the genetic health of the captive population continues to decline, so time is of the essence); (b) populations are separated but connected to one another through effective natural migration; (c) wolves are protected from human-caused losses; and (d) sufficient habitat remains available.

The recovery plans required by section 4(f) of the ESA, 16 U.S.C. §1533(f), are critical to this effort because they are the agency's "roadmap" to recovery. An important component of these roadmaps are the "objective, measurable criteria" that – when met – result in a determination that the species is fully recovered and can be delisted. These criteria must address the threats to the species and must be expressed quantitatively, whenever possible because they are the thresholds that establish what needs to occur *before* a species can be delisted. The importance of having science-based criteria in recovery plans that address *all* threats and inform all recovery

actions, therefore, cannot be overstated.

In this case, WildEarth Guardians *et al.* ("Guardians"), challenge the Service's November, 2017 recovery plan for the Mexican wolf ("recovery plan") which serves as the Service's "roadmap for the long-term conservation and recovery" of the subspecies. 85 Fed. Reg. 20967, 20968 (April 15, 2020). As outlined below, this recovery plan violates the ESA because it fails to include delisting criteria addressing *all threats* to Mexican wolves.

## BACKGROUND

### I. The ESA, recovery plans, and delisting criteria.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 179 (1978). The ESA was enacted to forestall the extinction of species, whatever the cost, and allow species to recover to the point where the protections afforded by the ESA are no longer necessary. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004). Survival and recovery are two different (though complementary) goals of the ESA. *Id*. To achieve these objectives, the ESA directs the Service to develop and implement recovery plans for listed species.16 U.S.C. § 1533(f)(1).

Recovery plans are considered "one of the most important tools" required by the ESA because they are a "roadmap" that lays out where the Service needs to go and how best to get there. D014124. Though largely guidance (not regulatory) documents, Congress nonetheless directed that all recovery plans include, to the maximum extent practicable, certain provisions, including "site-specific management actions" necessary to achieve recovery, an estimate of time and costs, and "objective, measurable criteria which, when met" would result in a determination that the species is

2

recovered and qualifies for delisting. 16 U.S.C. § 1533(f)(1)(B)(ii).

The directive to include delisting criteria in recovery plans is non-discretionary. The "word 'shall' is an imperative denoting a definite obligation," *Southwest Center for Biological Diversity v. Babbitt*, 1999 WL 33438081 at *5 (D. Ariz. 1999), and the ESA's use of the phrase "to the maximum extent practicable" does "not permit an agency unbridled discretion." *Defenders of Wildlife v. Babbitt*, 130 F. Supp.2d 121, 131 (D.D.C. 2001). The phrase indicates, rather, "a strong congressional preference that the agency fulfill its obligation to the extent that it is possible or feasible." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 111 (D.D.C. 1995). The plain language of the ESA thus demonstrates Congress' intention that recovery plans "incorporate delisting criteria where possible or feasible," *Southwest Center for Biological Diversity*, 1999 WL 33438081 at *5, and these criteria "must be directed towards the goal of removing the endangered or threatened species from the list." *Fund for Animals*, 903 F. Supp. at 111.

Relevant here, the delisting criteria required in recovery plans must be "objective and measurable" and "*address threats* to the species in terms of each of [the ESA's five listing and delisting] factors outlined in section 4(a)(1) of the ESA." D014198 (emphasis added). As explained by the Service, delisting criteria must include "an explicit analysis of threats under the five listing factors in addition to evaluation of population or demographic parameters." D014199. "By establishing criteria for each of the five listing/delisting factors that are currently relevant to the species . . . [the recovery plan] is "more likely to ensure that the underlying causes of decline have been addressed and mitigated prior to considering a species for delisting." *Id*.

This approach – the Service explains – should greatly simplify the delisting process: because the ESA directs that a species change in status should only occur when the recovery plan's criteria *are met*, *see* 16 U.S.C. § 1533(f)(1)(B)(ii), and a "change in status [is only] driven by a threats assessment, threats based recovery criteria are the best way to satisfy this goal." D002701. "Thus, every factor seen as a threat should include a corresponding recovery criterion." *Id*. "[H]abitat destruction might be addressed by the permanent protection of habitat; stochastic events might be addressed through redundancy; etc." *Id*.; *see also* E000606 (email emphasizing need to "develop recovery criteria based on specific threats relevant to the 5 listing factors.").

The five ESA threat factors that must be addressed in delisting criteria include: (1) the present or threatened destruction of habitat or range; (2) overutilization for various purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors. 16 U.S.C. § 1533(a)(1). "Since the same five statutory factors must be considered in delisting as in listing . . . [the Service], in designing objective, measurable criteria, must address each of the five statutory delisting factors and measure whether threats . . . have been ameliorated." *Fund for Animals*, 903 F. Supp. at 111 (citations omitted); *see also Defenders of Wildlife*, 130 F. Supp.2d at 133 (same); D014198 (guidance explaining the same); D014200 (same). A recovery plan, therefore, that "recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard." *Fund for Animals,* 903 F. Supp. at 108. "Nor

would a [recovery plan] that completely ignores threats to [the] conservation and survival of a species." *Id.*; *see also Defenders of Wildlife*, 130 F. Supp.2d at 133 (setting aside recovery plan that failed to include criteria addressing all threats); *Southwest Center for Biological Diversity*, 1999 WL 33438081 at *6 (same).

## II.     Recovery planning for the Mexican wolf. [2]

The first recovery plan produced for the Mexican wolf was released in 1982, *see* D015046, though it was more of a "survival" plan because at the time the Service saw "no possibility for complete delisting of the Mexican wolf" and felt that ensuring the "survival of the Mexican wolf" was the most that could be achieved. D015070. Because the 1982 plan was "[w]ritten against the backdrop of near-extinction," it did not provide any delisting criteria. *Center for Biological Diversity*, 2018 WL 1586651 at *7. The Service's recommendations were thus made with the "caveat that future revisions to the plan would be necessary to fully implement reintroduction and recover the species." *Id.*

Over the next several decades, the Service continued to breed Mexican wolves in captivity and in 1998 began releasing wolves into the wild in New Mexico and Arizona. *Id.* With no updates or revisions to the 1982 recovery plan, however, the Service continued to implement the recovery program without a "roadmap" for recovery and without delisting criteria. *See id.* at *8. In the early 1990s and early 2000s the Service tried to revise and update the

---

[2] For more background information, see Guardians' statement of facts ("Facts"), the background section in *Center for Biological Diversity v. Jewell*, 2018 WL 1586651 (D. Ariz. 2018), and the 2015 endangered subspecies listing, *see* D015940 (80 Fed. Reg. 2488 January 16, 2015).

1982 recovery plan and develop delisting criteria, but to no avail. *See* Facts at ¶¶ 45-47.

In 2010, the Service convened a team of the leading wolf scientists and experts known as the Mexican wolf recovery team's "science and planning subgroup" or "SPS" (hereinafter "science team") to prepare a new, revised recovery plan for the Mexican wolf that included science-based delisting criteria in accordance with the ESA. Facts at ¶¶ 56-58. After extensive research, modeling, and careful assessment of threats, the science team produced a complete (albeit draft) revised recovery plan for the Mexican wolf with delisting criteria and presented its findings in March, 2013. *See* D015865 (science team's presentation).

The delisting criteria developed by the science team included requiring: (a) at least three separate but connected populations of Mexican wolves in the wild (totaling at least 750 wolves); (b) natural Mexican wolf dispersal between the populations of at least one "genetically effective migrant" every generation (breeding required); (c) human-caused losses of less than 20 percent per year; and (d) approved and confirmed state management plans and regulatory protections after delisting. *See* D008078–79; *see also* Facts at ¶¶ 60-76 (science team's rationale for delisting criteria).

Following issuance of the science team's draft recovery plan and its science-based delisting criteria, however, the team was disbanded and work on the recovery plan was stopped. *See* Facts at ¶¶ 77-78. Litigation over the Service's failure to prepare a recovery plan subsequently ensued, *see Defenders of Wildlife v. Jewell*, No. CV-14-02472-JGZ (D. Ariz. 2015), and this case eventually settled when the agency agreed to produce a revised recovery plan by November 30, 2017. *See id*. In revising the plan, however, the Service

6

chose to start from square one, abandon the science team's work (including its draft recovery plan and science-based delisting criteria), and not reconvene the science team or otherwise consult the leading wolf scientists that had worked on (or contributed to) the earlier plan. *See* Facts at ¶ 78. Nor were many of the former members invited to participate in the formulation of a new recovery plan. *See id*.

Instead, the Service chose to formulate a new recovery plan with input from the affected states and Mexico. The Service held a series of six closed-door meetings and "workshops" limited to certain Service employees and representatives from the states of Arizona, New Mexico, Utah, Colorado, and Mexico from December, 2015 through February, 2017. *See* Facts at ¶¶ 79-90. During this time, the states took an active role in developing a new recovery plan and, in particular, formulating new delisting criteria. *See id*.

In June, 2017, the Service announced the availability of an entirely new draft recovery plan for public review and comment. *See* D009660. In response, the Service received numerous comments from the scientific community (including former science team members and wolf experts) and peer review members questioning the validity and adequacy of the new plan and, in particular, the plan's delisting criteria. *See* Facts at ¶¶ 92-107. A final recovery plan was published in November, 2017, *see* D009169.

The 2017 recovery plan's new delisting criteria represented a significant departure from the science team's previous criteria in the 2013 draft recovery plan. *Compare* D009179 (new criteria) *with* D008078 (science team's criteria). Mexican wolves will now be considered for delisting if: (a) there is only one population in the United States averaging 320 wolves; (b) one population in Mexico averaging 200 wolves; (c) a sufficient number of

Mexican wolves are released from captivity into the wild to result in 22 Mexican wolves "surviving to breeding age" in the United States and 37 in Mexico (but breeding not required); and (d) a commitment from states, tribes, and Mexico that they "will" ensure regulatory mechanisms are in place in areas necessary for recovery. D009199–9200.

### III.   Guardians' challenge to the 2017 recovery plan.

In 2018, Guardians – a coalition of organizations dedicated to ensuring the recovery of Mexican wolves with members who have Article III standing, *see* Exhibits A-E – challenged the Service's recovery plan, including the delisting criteria. *See* Doc. 22. The Service subsequently moved to dismiss this case for lack of jurisdiction (Doc. 24) and in March, 2019 this Court issued an order granting in part and denying in part this motion (Doc. 34).

Following this order, the sole issue remaining in this case is whether the recovery plan's delisting criteria address *all threats* to the Mexican wolf. Specifically, Guardians alleges a "recovery plan's criteria for delisting must address the threats to the listed species" and the "Service's criteria in the 2017 recovery plan does not address all threats to the Mexican wolves." Doc. 22 at 22. This Court agreed that this claim can proceed under the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(C), noting that jurisdiction under the ESA is proper to the extent Guardians' alleges the Service "failed to address all threats to Mexican wolves in its recovery plan" and "the agency failed to address problems that the agency itself identified, without offering an explanation as to why it was not practicable for the agency to do so . . ." Doc. 34 at 10–11. Here, the Service's recovery plan fails to include delisting criteria to address significant threats to Mexican wolves that the agency itself identified.

## STANDARD OF REVIEW

ESA claims are reviewed under the Administrative Procedures Act ("APA"). *NEC v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The APA directs courts to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court must not substitute its judgment for that of the agency but it must nonetheless engage in a "thorough, probing, in depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and "ensure the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coalition. v. Servheen*, 665 F. 3d 1015, 1023 (9th Cir. 2011). An agency's action is arbitrary if it relied "on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. Courts must also reject agency decisions based on an "erroneous interpretation of law." *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008).

## ARGUMENT

## I.     The recovery plan does not include delisting criteria addressing all threats to Mexican wolves.

The Service's recovery plan includes delisting criteria tied to population size and trend and includes a promise that states (and Mexico) will eventually invoke regulatory protections. But that is all. *See* D009179–80.

9

The recovery plan is devoid of delisting criteria to address: (A) genetic threats; (B) the threat from human-caused losses; (C) the threat from existing inadequate regulatory mechanisms; and (D) the threat from loss of suitable habitat, as required by the ESA.

### A.   No delisting criteria to address genetic threats.

The genetic threats facing Mexican wolves are serious. *See* Facts at ¶¶ 14-22. Carroll (2014) explains that the genetic threats "are greater for the Mexican wolf than for other wolf subspecies because [seven] wild founder individuals were the source for all wolves in both the captive and reintroduced populations." R001482.

The genetic challenges facing Mexican wolves include inbreeding (mating of close relatives), loss of heterozygosity (loss of genetic diversity or decrease in the proportion of individuals that have different alleles for a specific gene), and the loss of adaptive potential. *See* Facts at ¶¶ 14-22 (describing genetic threats). Many of these negative effects are already evident in the captive and wild populations of Mexican wolves, *see id.*, and need to be addressed quickly. As explained by the science team: "The genetic health of the captive populations continues to decline each year – inbreeding is increasing and heterozygosity is decreasing. We need to quickly establish and grow new populations in the wild." D015875.

The best available science reveals addressing the genetic threat to Mexican wolves requires a multi-faceted approach that includes establishing "adequately sized and genetically diverse core populations," as well as ensuring the populations are separated but "connected to one another through effective migration." D015867. For this reason, the science team concluded that multiple separate (but connected) population need to be

10

established in the wild: in order to "address extinction risk and genetic health . . . [three] populations for a total of [approximately] 750 wolves with the possibility of one additional population in Mexico" would be required and there must be "[e]ffective dispersal between populations." D015875. The science team also expressed the need to "quickly establish and grow new populations in the wild" in response to the declining health of the captive population. *Id*.

This is why the science team's 2012 draft recovery plan explicitly incorporated criteria to address genetic threats, including criteria: (1) on population size and configuration, i.e., a meta-population of at least three separate subpopulations; and (2) effective migration and connectivity between the subpopulations via natural dispersal at "a rate of at least [one] genetically effective migrant every generation . . ." D008079; *see also* D008083 (criteria); D015869 (same). As defined by the science team, a "genetically effective migrant" is "a wolf that breeds in a non-natal population and produces at least [one] pup that survives to at least December 31 of the year of its birth," i.e., a wolf that actually contributes genetic material and breeds in the wild. *Id*. "Dispersal of even a single migrant into such inbred populations can dramatically affect genetic structure and population performance." R001482.

This delisting criteria (and the science team's draft recovery plan that included it), however, was ultimately abandoned by the Service at the bequest of the states. *See* E015804; Facts at ¶¶ 87-89. The 2017 recovery plan removed the genetic criteria (discussed above) and replaced them with nothing comparable, *see id*. The new criteria only require: (a) the establishment of two isolated populations of wolves, one in the United States

11

and one in Mexico that reach certain population targets (320 and 200, respectively); and (b) *releases* from the captive Mexican wolf population "of a sufficient number of wolves to result in 22 released Mexican wolves surviving to breeding age in the United States population" and 37 released wolves "surviving to breeding age" in Mexico. D009199. But the term "surviving to breeding age" does not mean what it says, i.e., no actual breeding or improvement in the genetic status of wolves in the wild is required. The term means "a pup that lives two years to the age of breeding or an adult or sub-adult that lives for a year following its release." *Id.* This delisting criteria does not address the genetic threat facing Mexican wolves for three reasons.

### 1.   Only *effort*, not *results* are required.

First, even though the Service concedes that released Mexican wolves are only able to influence the gene diversity of the population if they "survive *and breed*" in the wild, D0009203 (emphasis added), and even though the Service knows that released wolves "only contribute their gene diversity to the recipient population when they *breed and produce offspring*," D009194 (emphasis added), its delisting criteria requires no evidence of breeding or new offspring.

The focus, rather, is solely on the *effort* the Service undertakes to improve the genetic status of Mexican wolves in the wild (by releasing wolves), not the *results* of those efforts. *See* D009199. The criteria only requires the release of a certain number of wolves that "live two years to the age of breeding" or an adult or sub-adult "that lives for a year following its release." D009179. As the Service admits: "We did not require that a released or translocated wolf survive and produce offspring in the population, as the basis for recovery criteria." D0009203. The Service thus assumes that by

12

releasing "x" number of pups or sub-adults or adults that they will achieve "y" number of wolves who produce a litter and contribute their genes to the wild population. But no breeding or actual exchange of genetic material is required. Nor is any improvement in the genetic status of the wild population. This is thus an arbitrary approach that violates the ESA. *See* 16 U.S.C. § 1533(f)(1)(B)(ii) (recovery plan must include criteria that "when met" would result in delisting decision).

Indeed, the Service's own recovery guidance explains that recovery plan criteria are results oriented, i.e., "values" or "standards" by which "it is determined that an objective has been reached." D014196. The purpose of establishing criteria in the recovery plan is to set a standard that must be *achieved* before delisting. The criteria include "measurable thresholds . . . needed to achieve the recovery vision." D016981; *see also* D014197 (same). "All actions should feed achievement of the criterion." D002701. A recovery plan "identifies the threats, identifies the criterion at which point . . . the threat will be sufficiently minimized, and all of the actions necessary to achieve said criterion . . . ." *Id.* As such, simply agreeing to release a certain number of wolves that survive to a certain age (the effort) – as required by the recovery plan's delisting criteria – is insufficient. It fails to ensure the achievement of any real, on-the-ground results when it comes to addressing genetic threats. As explained by the biologists, the recovery plan's criteria does not include any "requirement[] that the released wolves contribute genetically to the wild population via successful reproduction." C009239; *see also* E024999 (peer review comment noting and questioning the same).

13

1
2

### 2.   No accounting of the genetic status of Mexican wolves at the time of recovery.

3
4
5

Second, because the Service focused solely effort (not results), the delisting criteria do not account for the actual genetic status of Mexican wolves at the time of recovery.

6
7
8
9
10
11
12
13
14

As the Service is well-aware, there are a number of ways to objectively measure the genetic health of the Mexican wolf population in the wild. These include founder genome equivalents ("FGEs"), the amount of gene diversity retained, the mean inbreeding (co-efficient), population mean kinship, and effective migration. *See* Facts at ¶¶ 17-22. These are practicable, objective measures of the genetic health of the wild population that are already being measured and tracked by the Service, *see* R006152, and can easily be converted into delisting criteria to address genetic threats.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

In fact, every year the Service receives objective information about the genetics of the wild population, including the FGE, gene diversity, population mean kinship, inbreeding coefficient, and information on effective migration, *see, e.g.*, R006152, R006154, so the "genetic status of the wild population can now be directly and economically assessed using modern genetic techniques." C001951. But none of this is incorporated into the delisting criteria and the actual genetic health of the Mexican wolf population is not taken into account – at all. As explained during the peer review: the criterion requiring released wolves "surviv[e] to breeding age is no guarantee that a wolf will actually incorporate its genes to a population . . . So although this criterion is measurable, I am not sure it's the best measurement to make even with *estimates* of post-release survival and reproduction. If genetic diversity is the key metric here, why not define a target based directly on it and not an

14

indirect measure that may or may not reflect population status?" E024999 (emphasis in original). It makes "more sense to define a population target (e.g., observed heterozygosity), then adjust the releases accordingly instead of relying on assumptions about how well released animals integrate their genes into the population." *Id.*

In other words, the delisting criteria should actually address genetic threats "on a metric related to the actual genetic status of the wild population at the time of recovery, not a criterion that only records the history of recovery efforts (such as the number of individuals released)." C001951; *see also* C009239 (comment from biologists questioning criterion that fails to require actual contributions of genetic material to wild population). [3]

### 3.   No connectivity criteria.

Third, as the Service is well-aware, restoring "connectivity between fragmented populations is an important tool for alleviating genetic threats to endangered species." R001481; *see also* Facts at ¶¶ 24-28. "[I]ncreased dispersal between wild populations would help address the severe genetic threats evidenced in Mexican wolf populations." C001954; *see also* E000866 (explaining that connectivity reduces extinction risk by mitigating inbreeding depression (fitness) and slowing the loss of heterozygosity and adaptive

---

[3] The Service insists the number of releases is a sufficient metric to "achieve gene diversity in the wild population of approximately 90 percent of that retained in the captive population." D009203. But this is simply an assumption tied to a level of effort that ignores the key metric needed to address the genetic threat. *See* E024999. Wolves must survive *and breed* in order to influence genetic diversity. D009194. Further, aiming to achieve a gene diversity of 90 percent of the captive population (which is already experiencing genetic decline) sets the wrong baseline standard against which the genetic health of the population should be measured. *See* C001951-001952.

1    potential).

2        The Service itself recognized that Mexican wolves are threatened by

3    their small population size and isolation and require multiple, separate

4    populations with some level of effective migration or connectivity between

5    them to address genetic threats, lower the risk of extinction, and ensure

6    recovery. D015960; *see also* R001481 (Carroll (2014) explaining how

7    increased dispersal rates among small populations greatly lowered extinction

8    risk). Restoring connectivity between subpopulations is thus critical to

9    recovery. As explained by the science team, "[e]nsuring [Mexican wolf]

10   populations are connected to one another through effective natural

11   migration" is needed to alleviate the threats to the subspecies. D015867; *see*

12   *also* Facts at ¶¶ 24-28 (importance of connectivity). This is why the science

13   team put together a comprehensive memo on the need for connectivity

14   criteria, *see* D004114, and why the team explicitly insisted on connectivity

15   criteria being included in the recovery plan. *See* E000866–67 (explaining

16   rationale for connectivity criteria). But the 2017 recovery plan is devoid of

17   *any* connectivity criteria because the states objected it. *See* Facts at ¶¶ 87-90.

18

19       In the recovery plan, therefore, the Service recognizes the importance

20   of restoring connectivity and its influence on gene diversity, *see* D009194, and

21   acknowledges the "benefits of habitat connectivity" and says it will "work to

22   maintain and enhance connectivity within and between Mexican wolf

23   populations to improve gene diversity of Mexican wolves," D009195, but no

24   connectivity criteria is included. This was a political decision that generated

25   much criticism from the scientific community. *See* Facts at ¶¶ 104-106.

26

27       In lieu of connectivity criteria, the Service's recovery plan relies solely

28   on its releases of captive wolves and translocations to address genetic threats

16

of the wild populations. D009194. The Service considers this "genetic management" to be an effective alternative to natural dispersal and connectivity. *See id.* But as previously explained, this approach which is premised solely on the amount of releases (the effort) is a fallacy that does not address genetic threats. *See supra* sections II.A.1, II.A.2.[4]

**B.  No delisting criteria to address the threat from human-caused losses.**

The Service has long recognized that human-caused losses are a "significant" threat and "the biggest source of Mexican wolf mortalities since the reintroduction began in 1998." D015954; *see also* Facts at ¶¶ 29-34. Human-caused losses are any "events that function as mortalities to the population," D016936, including illegal killings, the intentional killing and removal of Mexican wolves in the wild in response to livestock conflicts, removals due to dispersal outside designated boundaries, vehicular collisions, accidental shooting and misidentification (from coyote hunters), and incidental trapping. *See* D015954, D015956-15957.

For this reason, the Service explains that "[m]ortality rates will need to be sufficiently low to achieve recovery criteria because they are the primary indicator of wolf population trajectory." D009200. "Mexican wolf populations are highly sensitive to adult mortality . . . [so] [f]or populations to grow or maintain themselves at demographic recovery targets, mortality rates will

---

[4] The Service's reliance human intervention after delisting also conflicts with the ESA. As this Court previously noted, relying on artificial human-intervention in the form of releases and translocations post de-listing conflicts with the ESA's definition of "recovery," which is designed to promote populations that are "self-sustaining without human interference." *See Center for Biological Diversity*, 2018 WL 1586651 at *4 (citation omitted).

need to stay below threshold levels" identified in Miller (2017), D008981, which is roughly 25 percent, *see* D009050.

To address this threat, the science team recognized the need to include delisting criteria in the recovery plan that specifically targets human-caused losses (from sources such as vehicular collision, illegal killing, and management removals) because ensuring such losses are not excessive is critical to alleviating extinction risk. D015858. Criterion three in the draft recovery plan was designed with this goal in mind: "The estimated annual rate of human-caused losses averaged over an 8-year period [must be] . . . less than 20% as measured by a statistically reliable monitoring effort." D008079. The science team explained this is "the greatest rate of anthropogenic mortality and removal that a Mexican wolf population could have and still be expected to have approximately 75% or greater chance of being stable or increasing." *Id.*

In the 2017 recovery plan, however, the Service arbitrarily chose to abandon the recommendations of its own science team and remove this criterion. In its place, the Service relies solely on demographic criteria (population size and trend) as a surrogate for assessing human-caused losses. This is a major oversight and violation of the ESA. *See, e.g., Defenders of Wildlife*, 130 F. Supp.2d at 133 (rejecting Service's use of population numbers as a surrogate for addressing ESA's threat factors); *Fund for Animals*, 903 F. Supp. at 112 (same).

As the Service's own science team recognized, the threat from human-caused losses is "different than overall mortality" levels and cannot be captured by demographic criteria alone. *See* D015874. Research also demonstrates there is a "well-established relationship between [human-

caused losses] and long term wolf population viability" and "extinction risk is highly sensitive to adult mortality (more so than census population size) and that controlling human-caused losses is the best way to promote dispersal which is critical (but difficult to achieve). D016501.

For these reasons, using population numbers as a surrogate to address this threat – as the Service is attempting to do here – is inappropriate. Recovery plan criterion must specifically target the specific threat (human-caused losses) it identifies. *See id*. This comports with the Service's own recovery guidance, which explicitly recognizes the need for each criterion to address each specific threat. *See* D014199. This same guidance also expressly recommends *against* doing what the Service did here, i.e., using population numbers as a surrogate for a species like Mexican wolves, which is heavily reliant on captive breeding programs. *See id*. Doing so is problematic because while population numbers may increase (due to captive releases), the threat from human-caused losses remains unabated. *See id*. [5]

### C. No delisting criteria to address the threat from inadequate regulatory mechanisms.

The Service considers the lack of adequate regulatory mechanisms to be one of the most serious threats to Mexican wolves because – even with the ESA's regulatory protections – wolves continue to be killed (and removed) in

---

[5] The science team initially debated whether this threat should be addressed through recovery actions, criterion, or both. *See* E000492 (notes); D016928 (additional "final" notes but ones that mistakenly confuse benefits/concern discussion); D014237 (notes on debate). The team ultimately chose to include it as a criterion, *see* D008079, to call human-caused losses out as a threat impacting population viability and because not doing so conflict with guidance from *Fund for Animals* that demographic criteria alone are insufficient to address specific threats. E00492; D016928 (same).

19

the United States and Mexico. D015955. This is likely to increase after delisting because any state regulations or penalties (assuming they exist) "would be less severe than current Federal penalties under the [ESA]." *Id*. "Thus, existing state penalties in Arizona and New Mexico would not serve as an adequate deterrent to illegal take." *Id*. This is why Service concluded that absent the ESA's regulatory protections "killing of wolves in the United States would increase, potentially drastically, because penalties are less severe than current Federal penalties." *Id*. The lack of existing regulatory protections is also a threat to Mexican wolves in Mexico. *See id*.

The Service's recovery planning guidance emphasizes the importance of addressing this threat in the delisting criteria. *See* D014199. The Service explains that even if a species is recovered and the population(s) have rebounded, the threat from increased take of the species "could recur after delisting if adequate regulatory mechanisms have not been put in place." *Id*.

This is why, when preparing the recovery plan and brainstorming about how to address threats in the criteria, the Service explicitly recognized the importance of ensuring state management plans and regulations are "sufficient" for delisting. *See* D015861. There is also a need to evaluate the adequacy of other "existing" plans, regulations, actions, and policies that may (individually or in the aggregate) pose a threat to Mexican wolf recovery. *See id*. These include, but are not limited to, law enforcement policies, predator control, livestock depredation and protection policies, existing wolf management regulations and policies (including the restrictions on movement and natural dispersal in the existing 10(j) rule), lack of funding for reintroduction, and unlimited coyote hunting in occupied habitat. *Id*.; *see also Center for Biological Diversity*, 2018 WL 1586651 at *13 (holding that the

Service's 10(j) rule was inadequate and failed to further the conservation of the species).

In order to address the threat from inadequate regulatory mechanisms, the science team insisted on criteria requiring "approved" state and tribal management plans and regulations, as well as an agreement with Mexico, be *in place* prior to delisting. *See* D008079. The team explained that "Service-approved state and tribal management plans codified by local statutes, and an agreement with Mexico such as an MOU" would need to be in place "to ensure viable populations can be maintained and are highly unlikely to need the protection of the ESA again." E019277; *see also* Facts at ¶¶ 72-74(plans and regulatory mechanisms must be "approved" and "confirmed").

The Service even outlined what would be required to comprise an adequate state management plan: "Components of an adequate plan will include assurances that: (1) the natural dispersal rate required for delisting is not precluded by [human-caused losses]; and, (2) management targets for population size are sufficiently large relative to delisting criteria and [human-caused loss] rates are sufficiently low to ensure that there is no greater than a 10% chance that the Mexican wolf will fall below the recovery criteria within a 10-year period. The best available science should be used to establish the long-term population target size and acceptable rates of [human-caused losses]." D007845; *see also* D008094 (same); D008079 (same).

This is typically how the threat from inadequate regulatory mechanisms are addressed recovery plan criteria, i.e., management plans and regulations for the species (after delisting) are reviewed and approved, confirmed, and demonstrated to be successful. *See, e.g.*, D007734 (criteria for river minnow); D007735 (same for Florida manatee); D007738 (same for sea

21

turtle).

Here, however, the Service removed this delisting criterion to address this specific threat. In its place, the Service simply requires states, tribes and Mexico to ensure – at some future date – that they *will* have regulatory mechanisms in place to protect Mexican wolves in the wild in areas it deems "necessary for recovery." *See* D009200.[6] "[W]e *will* ensure that the state and tribal agencies . . . have adequate regulations in place to prohibit or regulate human-caused mortality of Mexican wolves in those areas necessary for recovery [and] . . .[w]e *will* collaborate with these agencies during the implementation of the recovery plan as needed to prepare for a change in management . . . ." D009204–05 (emphasis added). Mexico "will also ensure that regulations are in place . . . ." D009205.

This approach is facially inadequate because it is premised entirely on what may occur in the future, i.e., what plans states, tribes, and Mexico *will* eventually develop after delisting. There are no specifics or details – let alone any information – on what regulatory mechanisms would be required to ensure the recovery of the Mexican wolf in the wild once federal protections are removed. This is arbitrary. *See Fund for Animals*, 903 F. Supp. at 113 (rejecting similar approach in grizzly bear recovery plan); *see also cf. Oregon Natural Resources Council v. Daley*, 6 F. Supp.2d 1139, 1154–55 (D. Or. 1998)(rejecting Service's attempt to rely on future plans and efforts that are not "currently operational").

As noted in *Fund for Animals*, the "promise" that future plans and

---

[6] The Service added the qualifier "in areas necessary for recovery" at the last minute but never defines what it means. *See* E022841.

regulatory mechanisms will be developed "suggests that the [Service] still has not gathered sufficient data." 903 F. Supp. at 113. To say, therefore, that future plans and regulatory mechanisms adequately address the threat from inadequate "existing" regulatory mechanisms "is paradoxical." *Id*. The Service simply cannot address the threat of inadequate *existing* regulatory mechanisms by relying on state or Mexican management plans that have yet (if ever) to be developed. [7]

### D.   No habitat-based delisting criteria.

 "Wolves are not habitat specialists but do require adequate prey, large areas, and protections from humans." D015866. The Service's 2017 Biological Report found that one of the "most important stressors, or conditions, that may influence the recovery potential of the Mexican wolf" is the need for "adequate habitat availability and suitability." D008979.

Mexican wolf recovery, in particular, will require large areas of suitable habitat, which for wolves means "forested, montane terrain containing adequate biomass of wild prey (elk, white-tailed deer, mule deer, and other smaller prey) to support a wolf population." D008979–80. Suitable habitat for wolves must also have "minimal roads and human development, as human access to areas inhabited by wolves can result in wolf mortality by facilitating

---

[7] Concerns about the adequacy of regulatory mechanisms in Mexico were expressed throughout this process. *See* Facts at ¶¶ 92-93. Further, as noted during peer review, "the U.S. has no authority over how wolves are managed in Mexico, regardless of MOUs or a recent history of dedicated recovery efforts." E025001. The Service's reliance on Mexico for recovery efforts is thus misplaced. *See, e.g.*, *Fund for Animals*, 903 F. Supp. at 115 (faulting the Service for failing to explain why Canadian grizzly bears were relevant to recovery in the United States).

illegal killing." D008980; *see also* Facts at ¶¶ 43, 92-98 (expressing concerns about habitat availability due to climate change, poor conditions in Mexico, and restrictions on dispersal north of Interstate-40).

As explained in the Service's 2017 biological report: "Successful Mexican wolf recovery will require that Mexican wolf populations occupy large areas of ecologically suitable habitat. Prey availability will need to be adequate to support populations, and land tenure and management . . . will need to support the occupancy and management of Mexican wolves across the landscape." D008981. The future loss of "ecologically suitable" habitat for Mexican wolves in both the United States and Mexico is thus a specific threat that the Service itself has identified. *See id*. This is why ensuring "adequate habitat availability to support viable Mexican wolf populations" is an explicit recovery objective in the recovery plan. D009198.

The recovery plan, however, does not include *any* habitat-based delisting criteria. *See* D009198-009200. The recovery plan includes a number of "actions" needed to ensure adequate habitat availability exists to support Mexican wolf recovery, including a general need to "maintain and protect" habitat in the United States and Mexico, improve livestock management, and "maintain or improve" native prey populations. D009212–13; *see also* D009242 (recovery implementation plan listing various actions). But such actions are not only vague and non-committal, they are untethered to the delisting criteria.

Indeed, there are no delisting criteria pertaining to the size and location of areas and habitat needed to protect Mexican wolves in the United States or Mexico. Nor are there any delisting criteria to ensure adequate prey species exist or any prescriptive limits on human access and livestock

24

1    management within Mexican wolf habitat. This is a major oversight. *See*

2    *Fund for Animals*, 903 F. Supp. at 112–13 (setting aside recovery plan for

3    failing to include habitat-based delisting criteria).

4                                        **CONCLUSION**

5            For the forgoing reasons, Guardians respectfully requests this Court

6    issue an order: (1) declaring the Service violated the ESA; and (2) remanding

7    the matter back to the Service to develop and incorporate delisting criteria

8    into the recovery plan that address *all threat*s to the Mexican wolf (or, in the

9    alternative, provide an adequate explanation as to why it is not practicable to

10   do so). *See, e.g., Defenders of Wildlife*, 130 F. Supp. 2d. at 134 (ordering

11   similar relief).

12           Respectfully submitted this 17th day of April, 2020.

13

14                                    <u>/s/ Matthew K. Bishop</u>
                                      Matthew K. Bishop

15

16                                    *Counsel for Plaintiffs in No. 18-00048*

17

18

19

20

21

22

23

24

25

26

27

28