**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al.,<br>Plaintiffs,<br><br>vs.<br><br>Deb Haaland, et al.,<br>Defendants,<br>and<br>New Mexico Department of Game and Fish,<br>Defendant-Intervenor. | No:  4:18-CV-00047-TUC-JGZ (Lead)<br><br>**ORDER** |
| WildEarth Guardians, *et al.*,<br>Plaintiffs,<br><br>vs.<br><br>Deb Haaland, et al., *et al*.,<br>Defendants,<br>and<br>New Mexico Department of Game and Fish,<br>Defendant-Intervenor. | No. 4:18-CV-00048-TUC-JGZ (Member) |

In November 2017, the United States Fish and Wildlife Service ("FWS" or "the Service") issued a revised recovery plan for the Mexican gray wolf, pursuant to Section 4(f) of the Endangered Species Act ("ESA" or "the Act"), 16 U.S.C § 1533(f). The "Mexican Wolf Recovery Plan First Revision" ("Plan" or "Revised Plan") is meant to serve as the Service's roadmap for the conservation and survival of the Mexican wolf, a

subspecies of the gray wolf. In the litigation presently before the Court, seven Plaintiffs[1] allege that, in developing the Plan, the Service violated Section 4(f) of the Endangered Species Act, 16 U.S.C § 1533(f)(1)(B), by failing to include (1) site-specific management actions necessary for conservation, and (2) objective, measurable criteria necessary for delisting the Mexican wolf. Plaintiffs ask the Court to remand the Plan to the Service for amendment in compliance with the ESA.

Pending before the Court are the parties' cross-motions for summary judgment, which are fully briefed.[2]  The parties have also filed notices of supplemental authority and responses to the notices. (CV-18-47 Docs. 71, 74, 75; CV-18-48 Docs. 54, 55.) After consideration of the parties' briefing and the administrative record, the Court will grant, in part, Plaintiff Center for Biological Diversity's motion for summary judgment, deny Plaintiff WildEarth Guardians's motion for summary judgment, and deny, in part, Defendants' cross-motions for summary judgment.

# I.      STATUTORY BACKGROUND

Passed in 1973, Congress enacted the Endangered Species Act, 16 U.S.C. § 1531, to protect and conserve endangered species. Described by the Supreme Court as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA reflects Congress's desire "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

---

[1] In this consolidated case, Plaintiffs include the Center for Biological Diversity, Defenders of Wildlife, Endangered Wolf Center, David R. Parsons, Wolf Conservation Center, WildEarth Guardians, and Western Watersheds Project (collectively "the Plaintiffs"). The Defendants include the Secretary of the Interior, Deb Haaland; United States Fish and Wildlife Service; FWS's Southwest Regional Director, Amy Leuders; United States Department of the Interior, Acting Director of FWS, Martha Williams; and Intervenor-Defendant New Mexico Department of Game and Fish (collectively "the Defendants"). The named public officials are the current holders of the offices. *See* Fed. R. Civ. P. 25(d) (providing for automatic substitution of public official's successor).

[2] The cross-motions for summary judgment, memoranda, and statements of facts in Case No. 18-CV-00047-TUC-JGZ are filed at Docs. 48, 56, 64 (Plaintiff CBD); 58, 59, 67 (Federal Defendants); and 61, 62, 69 (Intervenor-Defendant New Mexico Department of Game and Fish). The cross-motions for summary judgment, memoranda and statement of facts in case No. 18-CV-00048-TUC-JGZ are filed at Docs. 41, 42, 43, 50 (WildEarth Guardians); 44, 45, 52 (Federal Defendants); and 47, 48 (Defendant-Intervenor New Mexico Department of Game and Fish).

"Under the ESA, the Secretary of the Interior[] must identify endangered species, designate their 'critical habitats,' and develop and implement recovery plans." *Nat. Res. Def. Council, Inc. v. U.S. Dept. of Interior*, 13 Fed. App'x 612, 615 (9th Cir. July 5, 2001) (citation omitted). The Secretary's duties under the ESA are delegated to the Service pursuant to 50 C.F.R. § 402.01(b).

Congress pronounced the purpose of the ESA to be the conservation of listed species and the ecosystems upon which they depend, 16 U.S.C. § 1531(b), and declared a policy that all federal agencies "shall utilize their authorities in furtherance" of this purpose. *Id.* § 1531(c)(1). Conservation is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001) (citing 16 U.S.C. § 1532(3)).

Reflecting this conservation mandate, Section 4(f) of the ESA directs the Secretary to "develop and implement [recovery] plans . . . for the conservation and survival" of a species listed as endangered. 16 U.S.C. § 1533(f)(1). In doing so, the Secretary "may procure the services of appropriate public and private agencies and institutions, and other qualified persons." *Id.* § 1533(f)(2). The 1998 amendments to the ESA further require that the Secretary, in developing and implementing recovery plans, incorporate in each plan, "to the maximum extent practicable":

> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

> (iii) estimates of time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

*Id.* § 1533(f)(1)(B)(i)–(iii).  Further, the Secretary must "provide public notice and an opportunity for public review and comment on such plan," and then "consider all information presented during the public comment period prior to approval of the plan." *Id.*

1    § 1533(f)(4), (5).

2       "The recovery plan, once prepared, provides [a] 'basic road map to recovery, i.e.,

3    the process that stops or reverses the decline of a species and neutralizes threats to its

4    existence.'" *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1088 (D.

5    Ariz. 2009) (quoting *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 131 (D.D.C. 2001)).

6    "Any such plan is supposed to . . . provide a means for achieving the species' long-term

7    survival in nature." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 103 (D.D.C. 1995).  Yet,

8    despite the requirements of Section 4(f), the recommendations contained within a recovery

9    plan are not binding upon the agency, and the Secretary retains discretion over the methods

10   to use in species conservation.  *Conservation Congress v. Finley*, 774 F.3d 611, 620 (9th

11   Cir. 2014).

12      Section 11 of the ESA authorizes citizen suits "against the Secretary where there is

13   alleged a failure of the Secretary to perform any act or duty under [Section 4] of this title

14   which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1)(C).  To raise a

15   viable claim under this section of the ESA citizen-suit provision, a plaintiff must allege

16   that the Secretary failed to perform a non-discretionary duty mandated by Section 4.

17   *Bennett v. Spear*, 520 U.S. 154, 173 (1997); *Coos Cnty. Bd. of Cnty. Comm'rs v.*

18   *Kempthorne*, 531 F.3d 792, 809 (9th Cir. 2008).

19          **II.    FACTUAL AND PROCEDURAL BACKGROUND**

20      The Mexican gray wolf is native to the American Southwest. (AR D008960.)

21   Although the Mexican wolf population once hovered in the thousands, by the 1970s, the

22   wolves were believed to be extinct in the wild. (AR D008957-58.) In 1976, the Mexican

23   gray wolf was listed as an endangered subspecies under the ESA and, in 1982, the Service

24   released a "recovery plan" for the wolf. (*Id.*; AR D015046.) At that time, the recovery team

25   could not foresee full recovery and eventual delisting of the species due to its dire status.

26   (CV 18-47 Doc. 59 at ¶ 16; CV-18-48 Doc. 51 at ¶ 16.)

27      In 2010, the Service appointed a Mexican Wolf Recovery Team with a Science and

28   Planning Subgroup to draft an updated draft recovery plan. (AR D001234-35.) This

proposed plan was never finalized under Section 4(f) of the ESA. (AR D014103.)

In 2014, Plaintiffs sued the Service, alleging it had failed to complete a recovery plan for the Mexican gray wolf that complied with the requirements of Section 4(f).  *See Defs. of Wildlife v. Jewell*, No. CV-14-02472-TUC-JGZ, 2015 WL 11182029, at *1 (D. Ariz. Sept. 30, 2015).  The Court determined that Plaintiffs stated a claim that the Service failed to issue a revised plan that complied with the post-1988 requirements of Section 4(f), 16 U.S.C § 1533(f). *Defs. of Wildlife*, 2015 WL 11182029, at *9. The parties ultimately settled the case, and the Service agreed to produce a revised plan. *Defs. of Wildlife v. Jewell*, No. CV-14-02472-TUC-JGZ, 2016 WL 7852469 (D. Ariz. Oct. 18, 2016).

The revised plan, "Mexican Wolf Recovery Plan, First Revision," was completed in November 2017. (AR D009169.) In 2018, in this consolidated case, Plaintiffs filed suit challenging the Plan on various grounds. The Court dismissed the counts that were, "in essence, disagreements with the Service's determination as to how to best provide for the conservation and survival of the Mexican gray wolf," reasoning that these were "determinations within the agency's discretion and therefore unreviewable under the ESA's citizen-suit provision." *Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d 940, 946-949 (D. Ariz. 2019). The Court allowed the Plaintiffs to proceed with the counts that alleged the Service failed to include in the Plan, objective, measurable criteria and site-specific-management actions to address threats, or otherwise failed to offer a reason why it was not practicable for the agency to do so. *Id.* at 949-50.

## III.    STANDARDS OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate if the pleadings and supporting documents  "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles*

1  *Cnty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008). "Summary judgment is a

2  particularly appropriate tool for resolving claims challenging agency action." *Defs. of*

3  *Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D. Mont. 2010). In such cases the district

4  court's role is not to resolve facts, but to "determine whether or not as a matter of law the

5  evidence in the administrative record permitted the agency to make the decision it did."

6  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).[3]

7        **B**. **ESA Citizen-Suit Provision and APA Standard of Review**

8        The district court's review of the Plan is limited under the ESA's citizen-suit

9  provision, to claims that the Service did not fulfill its non-discretionary duties. 16 U.S.C.

10  § 1540(g)(1)(C). Allegations that are, "in essence, disagreements with the Service's

11  determination as to how to best provide for the conservation and survival of the Mexican

12  gray wolf . . . are determinations within the agency's discretion and therefore unreviewable

13  under the ESA's citizen-suit provision." *Ctr. for Biological Diversity*, 399 F. Supp. 3d at

14  946-949. The Service is not necessarily obligated "to include any one particular suggestion

15  that any given person deems important for species conservation." *Id*. at 949. Further, the

16  Service's duty to satisfy the requirements of § 1533(f) in developing a recovery plan need

17  not be based on the "best available science." *Id*.

18        Although "FWS has discretion as to the content of recovery plans, that does not

19  necessarily mean that there are no circumstances under which review of a plan might be

20  appropriate." *Id*. at 948. "A citizen may still bring suit under § 1540(g) when the [the

21  Service] fails to incorporate, to the maximum extent possible, one of the requirements from

22  § 1533(f)(1)(B) in a given recovery plan." *Id*. (citation omitted). A challenge to a recovery

23  plan is, therefore, reviewable if the challenge asserts that the agency failed to include site-

24  specific management actions and objective criteria "to address a problem the agency itself

25        [3] Several parties filed controverting statements of facts. (*See* Docs. 60, 63, 65, and
26  66 in 18-CV-00047-TUC-JGZ, and Docs. 46, 49, and 51 in 17-CV-00048-TUC-JGZ.)
Upon review, the Court concludes that, although the parties disagree about the legal
27  significance, the underlying content and accuracy of the administrative record is not in
dispute. Thus, this case is appropriate for resolution by summary judgment. *See Occidental*
28  *Eng'g Co.*, 753 F.2d at 769-70 (noting that in its review of an administrative proceeding
the district court decides legal question of whether the agency could reasonably have found
the facts as it did).

identified, without offering an explanation as to why it was not practicable for the agency to do so." *Id*. at 950.

Here, Plaintiffs' allegations that the Service failed to satisfy the requirements of § 1533(f)(1)(B) are reviewable. The arguments raised by the Plaintiffs necessarily require the Court to determine whether, as a matter of law, the proposed actions and criteria constitute "site-specific management actions" and "objective, measurable criteria," and whether, based on the record, the actions and criteria address the threats recognized by the Service. If the required elements are omitted, the Court must further determine whether the Service has provided a reason for the omissions, explaining why it is impractical to include the statutory requirements.

"Because ESA contains no internal standard of review," the APA standard of review governs. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (applying APA to failure to consult claim brought under ESA citizen-suit provision) (citation omitted); 5 U.S.C. § 706(2)(A). (Doc. 48-1 at 19-20; Doc. 58-1 at 18; Doc. 61 at 6.) The core inquiry is whether there is a rational connection between the site-specific actions and criteria chosen and the threats they are intended to address. *See Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (requiring rational connection between facts found and choice made). Further, if a reasonable basis exists, the court must accept a agency's explanation on why it was impracticable to include site-specific actions and criteria. *See Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (affirming agency action if reasonable basis exists). A court's review is "limited to the explanations offered by the agency in the administrative record." *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008).

## IV.    DISCUSSION

### A. Plaintiffs Have Article III Standing

The ESA's citizen suit provision permits "any person" to commence a civil suit— "an authorization of remarkable breadth when compared with the language Congress ordinarily uses." *Bennett v. Spear*, 520 U.S. 154, 164-65 (1987). This provision allows

1    standing to the fullest extent permitted by Article III. *Id.* at 164-66*; Amer. Soc. for*

2    *Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011).

3        An organization has Article III standing to bring suit on behalf of its members when

4    "its members would otherwise have standing to sue in their own right."[4] *Hunt v. Wash.*

5    *State Apple Advert. Comm.*, 432 U.S. 333, 343 (1977). To have standing to sue in one's

6    own right, a member "must have (1) suffered an injury in fact, (2) that is fairly traceable to

7    the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

8    judicial decision." *Sierra Club v. Trump*, 963 F.3d 874, 883 (9th Cir. 2020). Here the

9    Service challenges only the first requirement.  Thus, the Court must determine whether the

10   members of WEG and CBD have suffered an injury in fact.

11       Plaintiffs are asserting that the Service violated the ESA's procedural requirement

12   that a recovery plan include site-specific management actions and objective, measurable

13   criteria; Plaintiffs are not permitted by law to challenge the substance of the plan.  *See* 16

14   U.S.C § 1540(g)(1)(C); *see also Ctr. for Biological Diversity*, 399 F. Supp. 3d at 946-949.

15   Plaintiffs allege the Service's alleged error is a procedural one. Therefore, Plaintiffs must

16   prove a procedural injury. (CV-18-48 Doc. 52 at 6; Doc. 50 at 7; CV-18-47 Doc. 48-1 at

17   16.)

18       "In order to establish an injury in fact in the context of a claimed procedural error

19

20   _____

         [4] An organizational plaintiff must also show that the interests it seeks to protect are
21   germane to the organization's purpose, and neither the claim asserted nor the relief
     requested requires the participation of individual members in the lawsuit. *Hunt*, 432 U.S.
22   at 343. Although these two requirements are not challenged in this action, "it is well
     established that the court has an independent obligation to assure that standing exists,
23   regardless of whether it is challenged by any of the parties." *See Summers v. Earth Island
     Institute*, 555 U.S. 488, 499 (2009).  Here, Plaintiffs have set forth sufficient facts by
24   declaration to establish both requirements. Plaintiffs are organizations that are committed
     to conserving, protecting, and restoring the Mexican wolf and other imperiled species.
25   Some of the Plaintiffs have been dedicated, through legal action and otherwise, to
     conserving the Mexican wolf since the 1990s. Plaintiffs' interest in ensuring the Mexican
26   wolf recovery plan complies with the ESA is therefore germane to their purpose. Plaintiffs
     seek relief in the form of a remand of the recovery plan to the FWS for the purpose of
27   incorporating the statutory requirements under the ESA. Other than drafting declarations
     in support of their respective organization's standing, neither the claim that FWS violated
28   the ESA, nor the relief requested, requires the participation of any of the members.

1    in an agency's decisionmaking process, a plaintiff must show that '(1) the [agency] violated

2    certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it

3    is reasonably probable that the challenged action will threaten their concrete interests.'"

4    *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs.*, 887 F.3d 906, 918 (9th Cir.

5    2018) (citation omitted) (alterations in original). "That is, for Article III purposes, [a court]

6    may recognize a 'procedural injury' when a procedural requirement has not been met, so

7    long as the plaintiff also asserts a 'concrete interest' that is threatened by the failure to

8    comply with that requirement." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir.

9    2004). In the environmental context, "the desire to use or observe an animal species, even

10   for purely esthetic purposes, is undeniably a cognizable interest for the purpose of

11   standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992); *see also Friends of*

12   *Earth, Inc. v. Laidlaw Envir. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("We have held

13   that environmental plaintiffs adequately allege injury in fact when they aver that they use

14   the affected area and are persons 'for whom the aesthetic and recreational values of the

15   area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S.

16   727, 735 (1972))).

17          Applying these standards, the Court concludes Plaintiffs have Article III standing

18   to challenge the Service's failure to incorporate into the Plan the required site-specific

19   management actions and objective, measurable criteria.[5] First, Plaintiffs adequately assert

20   a violation of a procedural rule. Second, the requirement that site-specific actions and

21   objective, measurable criteria be included in a recovery plan was created to assist the

22   agency in ameliorating the threats to the Mexican wolf, thereby protecting Plaintiffs'

23   aesthetic interests in viewing the wolf. *See Kempthorne*, 607 F. Supp. 2d at 1088 (noting

24   that a recovery plan is a roadmap for the Service to use to neutralize threats to a species'

25   existence); *see also Fund for Animals*, 903 F. Supp. at 103 ("It is supposed to provide a

26          [5]  Because the organizational Plaintiffs have associational standing to sue on behalf
27   of their members, the Court need not also consider whether Plaintiff David R. Parsons has
     standing, although it appears from his declaration that he does. *See Friends of Santa Clara*
28   *River*, 887 F.3d at 918 (stating when there are multiple plaintiffs, only one plaintiff must
     have standing).

- 9 -

means for achieving the species' long-term survival in nature.") Third, because the recovery plan is supposed to be the process that neutralizes the recognized threats to the wolf's existence, the Service's alleged failure to identify actions and criteria in response to those threats creates a reasonable probability that Plaintiffs' interests in viewing the wolf in the future are threatened.

The Service does not cite any authority in support of its assertion that there can be no injury from a procedurally deficient plan because recovery plans are non-binding statements of intention and there is no assurance that any of the sought-after elements will actually be implemented.[6] A plaintiff is not required to demonstrate that a procedurally-proper recovery plan will necessarily protect their concrete interest in the species. *See City of Sausalito*, 386 F.3d at 1197 (plaintiffs are not required to show a procedurally proper EIS would protect their interests in the area); *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001) ("[P]laintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them."); *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993) ("Speculation that . . . redrafting the EIS might not change the Secretary's decision . . . is not relevant to standing."). Indeed this Court has previously held that a plaintiff has "standing to challenge the Secretary's failure to comply with ESA in developing the recovery plan although the incorporation of delisting objectives and criteria into the recovery plan may not necessarily result in . . . full recovery." *Sw. Ctr. for Biological Diversity v. Babbitt*, 1999 WL 33438081, *3-4 (D. Ariz. Sept. 3, 1999); *see also Ctr. for Biological Diversity v. Bernhardt*, 480 F. Supp. 3d 69, 74-75 (D.D.C. 2020) (finding Center of Biological Diversity had standing to challenge recovery plan).

//

---

[6] Plaintiffs assert that Defendants' argument may be a redressability argument. To the extent it is a redressability argument, it is misplaced. Redressability is satisfied when "the relief requested—that the agency follow the correct procedures—*may* influence the agency's ultimate decision." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (emphasis added). Although the ESA does not mandate compliance with recovery plans, FWS looks to the Plan as an advisory document, which may influence their decisions in conserving the Mexican wolf.

1

**B. Site-Specific Management Actions to Address Human-Caused Mortality**

2      Plaintiffs assert that the Service's Plan violates the ESA because it does not contain

3   site-specific management actions to address the recognized threat of illegal killing of

4   Mexican wolves.   Plaintiffs argue that the Plan provides only the vague goal that the

5   Service, state agencies, and Mexico "[r]educe human-caused mortality of Mexican

6   wolves."   Plaintiffs assert that the Plan leaves out any specifics of how to meet this goal,

7   any practical steps for how these agencies might reduce human-caused mortality, and fails

8   to explain why it is impracticable or unnecessary to recommend such action.  The Court

9   agrees.

10      Having recognized human-caused mortality as a threat to the wolf, the Service

11   acknowledges that it was required to incorporate in the Plan, to "the maximum extent

12   practicable," a description of site-specific management actions as may be necessary to

13   address the threat and achieve the goal of conservation and survival of the wolf.  (CV-18-

14   47 Doc. 58-1 at 27.)   The Service claims that the Plan provides numerous site-specific

15   management as may be necessary to achieve the Plan's goal, in the Recovery Action Table

16   at the end of the Plan.  (*Id.* at 23, 27.)

17      Section VI of the Plan, titled "Actions Needed," addresses "[r]ecovery actions,

18   which were developed for each objective, [to] guide site-specific activities to address

19   threats and achieve the recovery criteria." (AR D009208.)  Section VI directs the reader to

20   the Recovery Action Table for  "[r]ecovery actions, organized by recovery objective."

21   (AR D009208.)  The Recovery Action Table lists 24 "site-specific management actions,"

22   organized under the applicable recovery objective. (AR D009211-14.) Each site-specific

23   action also identifies which of three threats to the species the management action is meant

24   to address.[7]  (*Id.*) According to the Service, 16 of the 24 management actions listed in the

25   Table address the threat of mortality of the species. But review of the recovery actions

26

27      [7] The threat numbering system is: 1) loss of gene diversity; 2) extinction
risk/demographic stochasticity; and 3) exceeding threshold mortality rate. Each action is
assigned a  numerical priority (1, 2, or 3) to highlight the relative contribution the action
28   makes toward species recovery.  (AR D009214.)

shows that few relate to human-caused mortality.  Further, many of the listed actions are so vague as to not constitute an action at all.

Under the umbrella of the Plan Objective to increase the size of the wolf populations, site-specific actions 1.1 and 1.2 call for surveying and monitoring the wolves to determine their population status.  (AR D009211.) The Plan does not relate how this action is tied to or will address human-caused killings.  Similarly, actions 1.3 and 1.4 call only for monitoring the wolves on certain tribal lands. (*Id.*)

Site-specific actions 1.6 and 1.7, which call for reduction of human-caused mortality, do not identify any particular action that management intends to take to address the threat. (*Id.*) The "action"—reducing human-caused mortality—is identical to the objective—reducing human-caused mortality.  Restatement  of the threat does not constitute a management action which will address the threat.  Similarly, site-specific action numbers 1.8 and 1.9 call for a reduction in Mexican wolf-livestock conflicts in the U.S. and Mexico, but fail to identify any management action which might be employed to reduce such conflicts.  (AR D009211-12.)

Under the umbrella of the Plan Objective to ensure adequate habitat, site-specific action 3.4 pertains to maintaining or improving the status of native prey populations of Mexican wolves. (AR D009213.) Any link between this action and human threats is unstated.  More importantly, no specific management actions are specified that would improve the status of native prey.  Likewise, site-specific action 2.4 falls under the Plan Objective of improving gene diversity and maintaining the health of Mexican wolves.  Action 2.4 calls for monitoring and managing Mexican wolf health.  (AR D009212.) It does not identify an action which would address the threat of illegal killing.

Specific-site actions 5.1, 5.2 and 6.4 are the closest that the Plan gets to including management actions to address the threat of human-caused mortality. Action 6.4 calls for developing adequate regulations and management and monitoring plans to maintain viable Mexican wolf populations after delisting.  (AR D009214.) Actions 5.1 and 5.2 call for conducting education and outreach programs on Mexican wolf conservation in the U.S.

and Mexico. (AR D009213.) The stated actions are so vague, however, that one must speculate and guess what educational action or regulatory development might be taken which would pertain to reducing human-caused mortality.

The Court acknowledges that "[i]t is not necessary for a recovery plan to be an exhaustively detailed document." *See Fund for Animals*, 903 F. Supp. at 106 (noting that the term "specific" modifies the term site, not the term "actions").   Nonetheless, "[a] recovery plan that recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard." *Id.* at 108.  Here, the Service does not assert that it would be impracticable to include site-specific management actions addressing human-caused killing in the Plan. Rather, the Service claims that the actions included in the Plan are sufficient, and asserts that the ESA provides neither a definition nor parameters for "site-specific management actions."  (CV 18-47 Doc. 52 at 12.)   But the ESA requires inclusion of site-specific management actions "to the maximum extent practicable."  16 U.S.C. § 1533(f)(4). "[T]he phrase 'to the maximum extent practicable' does not permit an agency unbridled discretion." *Fund for Animals*, 903 F. Supp. at 107. Under the statute, the agency has a "clear duty . . . to fulfill the statutory command to the extent that it is feasible or possible." *Id.*

The Service's separate Recovery Implementation Strategy demonstrates that site-specific actions can be included in the Plan.  The Strategy "provides additional detailed, site-specific near-term activities needed to implement the actions identified in the recovery plan." (AR D009208.)   It lists actions specifically tied to the threat of human-caused mortality, including actions listed under a category specifically addressed to reducing this threat. For example, site-specific action 1.6.1 proposes to conduct education and outreach "to improve public tolerance of wolves," including education on techniques to reduce conflicts with livestock for school children, communities, landowners, livestock producers, and the general public.  (AR D009235.)  Site-specific action 1.6.2 is similarly identified as

a management action to reduce human-caused mortality. Action 1.6.2 provides for increasing law enforcement presence by hiring Conservation Law Enforcement Officers to assist in educating the public, in particular hunters and recreationists, to assist with investigations of wolf mortalities, and to coordinate with law enforcement from other agencies. (*Id*.) The Implementation Strategy identifies several other concrete actions to address the threat of human-killings, including the installation of enhancements to facilitate Mexican wolf movement across existing and new roads to help reduce vehicle collisions with Mexican wolves (action 1.6.4); reducing wolf-livestock conflicts with proactive measures, increased monitoring, hazing, translocations and removal (action 1.8.3); compensating livestock producers for losses due to wolves (action 1.8.4); and providing funding for wolf presence on or near livestock operations (action 1.8.5). (AR D009235, D009237.)

The Service recognizes the Implementation Strategy is not a substitute for the Plan itself, but suggests that the Court consider the Strategy as further evidence that the Plan addresses the threat of human-caused mortality to the species through site-specific actions. (CV-18-48 Doc. 52 at 14.) However, the Service does not claim that it would be impracticable to include the management actions contained in the Implementation Strategy in the Plan. While the Service states that it is impracticable to include in the Plan "specific sites" for proposed management actions, the Service does not argue that, and the record does not provide any rationale to explain why, the management actions contained in the Implementation Strategy could not be included in the Plan. (*See* AR D009208) (noting that "[p]lan does not provide more specific locations for actions for which locations cannot be determined until future conditions are known" and that the Service anticipates "being able to provide a *greater degree of site-specificity* in the implementation strategy than the recovery actions in the recovery plan" (emphasis added)).

Because the Court concludes that the Plan does not include site-specific actions and the Service has failed to offer an explanation as to why it was impracticable to include such actions in the Plan, the Court will remand this matter to the Service for a recovery plan that

complies with 16 U.S.C. § 1533(f)(1)(B).

**C. Objective and Measurable Criteria**

Plaintiffs assert that the Revised Plan fails to include objective, measurable criteria to assess the threat of human-caused mortality; the threat from inadequate regulatory mechanisms; genetic threats; and threats to habitat.  Plaintiffs argue that, because the Service failed to address a problem that the agency itself identified, without offering an explanation as to why it was not practicable for the agency to do so, the Plan violates the ESA.  (CV-18-47 Doc. 64 at 18 (citing *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 950)).

**1.  Human-Caused Mortality Criteria**

The Service has recognized that human-caused mortality, including illegal killings, is a continuing threat to the Mexican wolf. (AR D009189.) Thus, the ESA requires the Service, in developing and implementing the Recovery Plan, to include objective, measurable criteria which, when met, would measure the extent of human-caused mortality and whether that threat is being ameliorated. *See Ctr. for Biological Diversity*, 399 F. Supp. 3d at 949-50.  The Court concludes that the Service fulfilled its statutory duty to address in the Plan the threat of human-caused mortality and that there is a rational connection between the Plan criteria and the threat of human killing.

The Recovery Plan addresses the threat of human-caused mortality in its objective and measurable criteria pertaining to abundance and the adequacy of regulatory mechanisms.  With respect to criteria pertaining to abundance, the Plan provides that the Mexican wolf will be considered for delisting when:

(1) a minimum of two populations meet all abundance [] criteria as follows:

(a) The population average over an 8-year period is greater than or equal to 320 wolves (e.g., annual wolf abundance of 200, 240, 288, 344, 412, 380, 355, and 342 averages 320 wolves);

(b) The population must exceed 320 wolves each of the last 3 years of the 8-year period; [and]

(c) The annual population growth rate averaged over the 8-year period is stable or increasing (e.g., annual averages of 1.2, 1.2, 1.2, 1.2, 1.2, 0.9, 0.9, and 1.0 averages 1.1).

(AR D009199.)  The Service explained in the section of the Plan entitled "Rationale for Recovery Criteria," that the Service adopted the population abundance criteria to "ensure that populations are resilient and the threats . . . of human-caused mortality have been ameliorated." (AR D009200.) According to the Plan, "[m]ortality rates will need to be sufficiently low to achieve recovery criteria because they are a primary indicator of wolf population trajectory." (*Id.*)  The Plan cites a population viability analysis for the Mexican wolf showing that "population performance is highly sensitive to relatively small changes in adult mortality rate." (AR D009201.)  The analysis concludes that mean adult mortality rates would need to be "less than 25%, combined with mean sub-adult mortality rates less than 33% and mean pup mortality . . . less than 13%" for there to be an "increasing population that meet[s] the population abundance recovery criteria." (*Id.*) Based, in part, on the population viability analysis, the Service considers these mortality rates to be acceptable and an appropriate measurement of whether, based on the population criteria, the human-caused mortality threat has been ameliorated. (*Id.*)

Plaintiffs assert the Service must create criteria that directly measure the appropriate rate of human-caused mortality and state that the population criteria does not *adequately* measure success in alleviating the threat of human-caused mortality. Plaintiffs assert that using population abundance criteria as a substitute violates the ESA.[8] The Plaintiffs cite to the Service's Recovery Planning Guidance, which provides that population parameters may not have been accurate in assessing threats in some cases. (AR D014199.)

The Court concludes that these arguments challenge the Service's determination of how to best provide for conservation of the Mexican wolf, which is a determination within the agency's discretion, and therefore unreviewable. *See Ctr. for Biological Diversity*, 399 F. Supp. 3d at 949.   In addition, the fact that population criteria sometimes do not

---

[8]   In support, Plaintiffs cite *Fund for Animals*, 903 F. Supp. at 112, and *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133 (D.D.C. 2001). However, in these cases the Service failed to explain how the population abundance criteria addressed the threats to the species. In contrast, in the case at bar, the Service clearly explained how the population abundance criteria and human-caused moralities are directly related, and how the abundance criteria consider and measure the human-caused mortality rate the Service deems appropriate.

adequately measure success, does not mean that use of such criteria in the present case is arbitrary or capricious. That fact that more accurate measurements may be available is not a factor the Court can consider. The Court concludes that the Service has established a rational connection between the population criteria and the threat of human-caused mortality, and thus has fulfilled its statutory obligation.

### 2.  Inadequate Regulatory Mechanisms Criteria

The Service states that its criteria addressing inadequate regulatory mechanisms address not only that threat but also the threat of human-caused mortality.  (CV-18-47 Doc. 58-1 at 29.)  That delisting criterion provides:

> States and Tribes will ensure regulatory mechanisms are in place to prohibit or regulate human-caused mortality of Mexican wolves in those areas necessary for recovery such that the Service determines that at least 320 Mexican wolves are likely to be maintained in the United States in the absence of Federal ESA protection.

(AR D009199-9200.)

Plaintiffs argue that the criterion is neither objective nor measurable, as it relies on the Service's subjective determination as to the adequacy of unspecified regulatory mechanisms. In addition, Plaintiffs argue that the criterion is insufficient because the measure responds only to the threat of inadequate regulatory mechanisms to limit post-delisting mortality under listing factor 4(a)(1)(D), and therefore fails to address the Service's finding that the Mexican wolf is threatened (under ESA listing factor 4(a)(1)(C)), "[b]ased on the continuous occurrence of illegal shooting taking place while the Mexican wolf is protected by the Act."  (Doc. 64 at 24.)  Plaintiffs conclude that the regulatory criterion violates the ESA because it is based on future plans that States and Tribes will take after delisting.  Plaintiffs cite *Fund for Animals*, 903 F. Supp. at 113, and *Oregon Natural Resources Council v. Daley*, 6 F. Supp. 2d 1139, 1154-55 (D. Or. 1998), in support.

The Court disagrees with Plaintiffs' characterization of the criterion. The criterion is objective and measurable because it requires regulations to be implemented that will maintain a wolf population of 320 wolves. (AR D009200.) The Plan also requires that regulations be in place so that the population abundance criteria is retained. (AR D009204.)

In fact, Plaintiffs acknowledge that the Service can objectively measure the success of regulations by looking to population data.[9] (CV-18-48 Doc. 42 at 26.) Further, the regulations, although providing a general directive, are not completely lacking in specificity as Plaintiffs suggest. The criterion requires that the proposed regulations "prohibit or regulate human-caused mortality of Mexican wolves." (AR D009200.) Lastly, the criterion does not provide that States and Tribes may ignore the current threat of inadequate regulations by developing regulations *after* delisting. The criterion requires that States and Tribes "will ensure regulatory mechanisms *are in place* to prohibit or regulate human-caused mortality of Mexican Wolves in those areas necessary for recovery." (AR D009200.) And the Plan's Rationale for Recovery states that "*[p]rior to delisting*, [the Service] will ensure that the state and tribal agencies that will be responsible for maintaining the recovered status of the Mexican wolf have adequate regulations in place to ensure levels of human-caused mortality will enable the population to retain the population abundance specified by the abundance criterion." (AR D009204 (emphasis added).)

Plaintiffs' reliance on *Oregon Natural Resources Council* and *Fund for Animals*, for the proposition that recovery actions cannot be based on future actions, is misplaced. In *Oregon Natural Resources Council*, the court held that "the Secretary may not rely on plans for future actions to reduce threats and protect a species as a basis for deciding that listing is not currently warranted." 6 F. Supp. 2d at 1154. Future actions are not relevant to the determination of whether a species should be listed.  In that context, the Service is required to consider the present status of a species.  In contrast, in the context of recovery plans, a plan's purpose is to identify future actions and criteria that would result in delisting,

---

[9]   The Court acknowledges that there are inherent difficulties in developing objective and measurable criteria to evaluate whether regulations implemented by other governmental bodies will successfully address the threat of illegal killings of wolves after the protections of the ESA are lifted, as the specific threat is inadequate regulations, absent the ESA. As explained in the Service's Recovery Planning Guidance: "[A] measurable and objective criterion may be for a state to have a management plan in place that . . . will manage the species effectively after the species is delisted. This criterion is measurable and objective (although there's some subjectivity with regard to whether the plan will be effective), without having a numerical component." (AR D014198.)

if met.  *Fund for Animals* is inapplicable because it is factually dissimilar from the present case.  The *Fund for Animals* court found that a recovery plan did not satisfy the "objective, measurable criteria" requirement because the plan did not include criteria to address the inadequacy of existing regulatory mechanisms, despite having identified that inadequacy as a threat. 903 F. Supp at 113. There, the Service said that it would include the criteria in a yet to be developed Conservation Strategy. *Id.* In contrast, in the present case, the Service included criteria to address inadequate regulatory mechanisms in the recovery plan.

### 3.   Genetic Criteria

Loss of gene diversity is identified by the Service as a threat to the Mexican wolf in the listing and in the Plan. (AR D015961, D009189.)  The Plan includes one criterion to address genetic threats.  The Plan provides that the Mexican wolf will be considered for delisting when a minimum of two populations meet (in addition to all abundance criteria) the following genetic criterion:

> Gene diversity available from the captive population has been incorporated into the United States population through scheduled releases of a sufficient number of wolves to result in 22 released Mexican wolves surviving to breeding age in the United States population.

(AR D009199.)  "Surviving to breeding age" is defined as a pup that lives 2 years to the age of breeding or an adult or subadult that lives for a year following its release.  (*Id*.) "Scheduled releases" means captive releases and translocations that achieve genetic representation, as described in the Plan's "Rationale for Recovery Criteria."  (*Id*.)

The Court disagrees with Plaintiffs' contention that the Service failed to include any delisting criteria in the Plan to address genetic threats.  Plaintiffs' argument is that the criterion that is included is so insufficient that it is arbitrary. Plaintiffs argue that measuring genetic diversity by the number of releases or survival to a certain age measures only the Service's efforts, and not the results of those efforts. Plaintiffs assert that the delisting criterion does not measure the wolves' actual genetic status. Finally, Plaintiffs argue that, although the Service recognizes that connectivity is an important tool for alleviating genetic threats and slowing the loss of adaptive potential, the Plan does not include any

1   connectivity criteria; it merely provides that the Service will work to maintain and enhance

2   connectivity within and between wolf populations.

3           The Court concludes that the criterion is not arbitrary or capricious because the

4   Service has provided a rational explanation as to how the recovery criterion addresses the

5   genetic threat to the Mexican wolf.  In the Plan, the Service explains that the gene diversity

6   criterion is meant to "ensure[] that Mexican wolf populations have genetic representation

7   and that genetic threats have been ameliorated." (AR D009202.) The Service considers the

8   degree to which wild populations contain the gene diversity available from the captive

9   population to be an important indication of genetic representation for recovery. (*Id.*) The

10  Service concluded "approximately 90% [gene diversity] to be reasonable for recovery

11  because it ensures wild populations contain a high degree of the gene diversity available."

12  (AR D009203.) The Service looked at several release scenarios and models that are able to

13  achieve 90% gene diversity of the captive population in the wild by model year 20 (2035),

14  even when not all released wolves incorporated into the population contribute offspring.

15  The metric employed (number of animals that survive to breeding age), coupled model

16  performance with performance of the wild populations.  (*Id.*)  Even including a low level

17  of dispersal/connectivity (approximately 1 wolf every 12-16 years), the model predicts that

18  at this level of release and at the predicted first year mortality rate, gene diversity will be

19  achieved in the wild wolf population of approximately 90% of that retained in the captive

20  population if the delisting criterion—survival of 22 wolves released—is met. (*Id.*) [10]

21          The Court also disagrees with Plaintiffs' assertion that "only effort, not results are

22  required." The criterion provides that the released wolves must survive to breeding age,

23  and the models cited by the Service contemplate both the anticipated level of release and

24  predicted mortality rate to achieve genetic representation. (AR D009200, D009202-04.)

25  Moreover, as the Service explained, it is not able to control breeding events in the wild.

26  The Court understands, but is not persuaded by, Plaintiffs' argument that there are methods

27          [10] The Court disagrees with Plaintiffs' argument that the 90% target is not

28  incorporated in the Plan.  The genetics criterion incorporates the 90% gene diversity goal
    because  the criterion contemplates needing to release 70 wolves in order to have 22 wolves
    survive to breeding age and reach the 90% target.

1    that could be employed to more directly measure the wolves' genetic makeup. The Court

2    is not authorized to determine whether the Service's means of addressing genetic threats is

3    the best. *See Ctr. for Biological Diversity*, 399 F. Supp. 3d at 946-949 (holding that the

4    Service is not required to include any particular suggestion that one might deem necessary

5    for conservation of a species).  In sum, the Court finds that the Plan's genetic criterion to

6    address the threat of loss of gene diversity is not arbitrary or capricious and that the Service

7    has fulfilled its obligation under the ESA to address this threat.

8                **4.  Habitat Criteria**

9           Plaintiffs argue that the Service's failure to identify objective, measurable criteria

10   related to habitat violates the ESA. Plaintiffs highlight the importance of suitable habitat

11   for wolf recovery and argue that the future loss of habitat is a specific threat to the Mexican

12   wolf.

13          In 2015, during the listing process, the Service did not identify habitat as a threat to

14   the Mexican wolf.   (AR D015951.) In the Plan, the Service explains that "habitat

15   destruction, modification, or curtailment (Factor A) is not threatening or endangering the

16   Mexican wolf, yet ensuring adequate habitat is available to support [the] recovered

17   Mexican wolf population into the future is central to the recovery effort for the Mexican

18   wolf (e.g., a potential stressor)." (AR D009189.) The Plan relies on the 2017 Biological

19   Report, which cites a 2017 habitat suitability analysis stating, "results suggest that there is

20   still sufficient habitat remaining . . . to support viable populations of the Mexican wolf in

21   the wild." (AR D009157.) Because the Service considered Factor A—"the present or

22   threatened destruction, modification, or curtailment of its habitat range," 16 U.S.C. §

23   1533(a)(1)(A) —and found habitat was not a threat to the Mexican wolf, and because there

24   is a rational basis for this conclusion, the Court concludes that the Service need not develop

25   habitat criteria. *Cf. Fund for Animals*, 903 F. Supp. at 111 (recovery plan violated ESA

26   because it identified habitat degradation to be a threat but failed to identify criteria to assess

27   the present or threatened destruction of habitat).

28   //

**CONCLUSION**

For the foregoing reasons, **IT IS ORDERED**:

1. The Motion for Summary Judgment filed by Plaintiffs Center for Biological Diversity et al. (Doc. 41 in 18-CV-00048-TUC-JGZ) is **GRANTED IN PART AND DENIED IN PART;**

2. The Motion for Summary Judgment filed by Plaintiffs WildEarth Guardians et al. (Doc. 48 in 18-CV-00047-TUC-JGZ0) is **DENIED**;

3. Defendants' Cross-Motions for Summary Judgment (Docs. 58 & 61 in 18-CV-00047-TUC-JGZ and Docs. 44 & 47 in 18-CV-00048-TUC-JGZ) are **GRANTED IN PART AND DENIED IN PART**.

4. The Mexican Wolf Recovery Plan First Revision is **REMANDED** to the Service for further action consistent with this order.   The Service must produce a draft recovery plan for public comment within six months that includes site-specific management actions, with a final plan to follow no later than six months thereafter.

Dated this 14th day of October, 2021.

Honorable Jennifer G. Zipps
United States District Judge